**HOBBS & COMPANY, INC.**

v.

**AMERICAN INVESTORS MANAGEMENT, INC. and Harry M. Weenig, Appellants.**

**No. 77–1445.**

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1978.

Decided May 4, 1978.

---

Israel Packel, John C. McNamara, Jr., Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for appellants.

William T. Hangley, Stephen M. Foxman, Goodman & Ewing, Philadelphia, Pa., for appellee.

Before ADAMS, BIGGS and WEIS, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

This is an appeal, pursuant to 28 U.S.C. § 1291, from a final judgment of the United States District Court for the Eastern District of Pennsylvania, dated January 24, 1977. On December 31, 1974, appellee Hobbs & Company, Inc. ("Hobbs") institut-ed suit against seventeen defendants, including appellants herein, American Investors Management, Inc. ("AIM") and Harry M. Weenig ("Weenig"). The action arose out of Hobbs' 1973 investment in SME Florida Partners Ltd. ("SME"), a limited partnership organized to develop condominiums in Florida and to provide tax benefits to the investing limited partners. AIM was the general partner in SME, and Weenig was a shareholder,[1] director, and officer of AIM. Hobbs' complaint, charging violations of federal and state securities laws as well as common law fraud, alleged that the defendants, including AIM and Weenig, used fraudulent and deceptive means to induce Hobbs to purchase a limited partnership interest in SME for $150,000, and that as a result Hobbs was entitled to recover compensatory damages in excess of $400,000 as well as punitive damages.

After extensive pre-trial proceedings, a Settlement Agreement was entered into by the parties on January 6, 1976. This Agreement was approved by the district court and Hobbs' action was dismissed with prejudice. In addition to providing for cash payments to Hobbs,[2] the Settlement Agreement contained, *inter alia*, the following pertinent provisions. (1) SME had invested in two development projects, "Jacaranda" and "Tamarac," but had substantially defaulted on the principal, interest, and tax payments on both properties. Under Paragraph 6 of the Settlement Agreement, AIM, but not Weenig, agreed to "make all payments including payments of mortgage principal, interest and taxes necessary to preserve intact and keep free from any cloud on title or liability the ownership interest of SME . . . in . . . Jacaranda and Tamarac, through January 1, 1978."[3] (2) The limited partnership inter-

---

1. There is a factual dispute as to whether Weenig was the sole or the principal shareholder of AIM. The resolving of this dispute may be relevant but we cannot perceive whether it is on the present insufficient record.

2. Paragraph 1 of the Settlement Agreement provided that certain of the defendants, including Weenig but not AIM, were to make immediate cash payments to Hobbs aggregating $91,000. Of this amount, Weenig's obligation was $21,000. Although the defendants, as a group, were delinquent in making these payments, Hobbs eventually received most of the cash with the aid of a court order.

3. The Jacaranda property had been purchased for $1,406,468. The sum of $953,962 was paid as a down payment, leaving a balance of $452,-506 payable in four equal payments of $113,-

ests had been marketed as a tax shelter. Paragraph 7 of the Agreement stated that AIM and Weenig represented and guaranteed that certain tax consequences were available to the limited partnership for the years ended December 31, 1973, 1974, and 1975, and promised to prepare and file tax returns and reports necessary to secure such benefits. Upon failure of these undertakings, AIM and Weenig agreed to pay Hobbs such amount of money as would put it in the same position which would have resulted had the promised tax consequences been made available. (3) With respect to remedies in the event of default by any settling defendant, Paragraph 10 of the Agreement provided that "[u]pon the default, failure or delinquency of any defendant in making any payment of any money, in delivering or satisfying any note or in the performance of any undertaking to which such defaulting defendant has agreed, then the dismissal compromise and settlement of plaintiff's claims against such defaulting defendant provided for in this Stipulation and Agreement shall be void and of no effect solely as to such defaulting defendant. . . ." Paragraph 10 further provided that "this Court shall retain jurisdiction of this action solely for the purpose of enforcing the undertakings contained in this Stipulation and Agreement. . . ."

On May 17, 1976, Hobbs filed a motion with the district court to enforce against AIM its obligations with respect to Jacaranda, as set forth in Paragraph 6 of the Settlement Agreement, to hold AIM and Weenig in civil contempt on account of their willful breach of the Agreement, and to order AIM and Weenig to pay Hobbs' attorneys' fees. Hobbs contended, *inter alia*, that AIM had failed to make the Jacaranda payments when due and did not intend to make future payments, and that Jacaranda's mortgagee, Gulfstream Land & Development Corp. ("Gulfstream"), had declared the mortgage in default and initiated foreclosure proceedings.[4] According to Hobbs, the court convened a telephonic hearing by conference call on May 17, 1976, which was participated in by the court, counsel for Hobbs, Weenig, AIM (by Weenig), and various other counsel. On May 19, 1976, the court ordered AIM to pay *instanter* all delinquent and current installments of mortgage principal, interest, and taxes on Jacaranda and to thereafter make all such payments through January 1, 1978; enjoined AIM and Weenig, among others, from doing any act inconsistent with or interfering with the performance of the Settlement Agreement and Order; and or-

127, all of which was either delinquent on the settlement date or due before January 1, 1978. Although the payments on Tamarac were similarly in default, the partnership's equity in Tamarac was much smaller and the property was considered less valuable than Jacaranda. Therefore, Hobbs agreed in Paragraph 6 of the Agreement that the abandonment of Tamarac, with the approval of a majority of the limited partnership interests in SME, would not be deemed a breach of the settlement agreement. In fact, Tamarac was eventually abandoned.

4. In a letter to Hobbs' attorney, dated March 16, 1976, counsel for AIM and Weenig took the position that the language of Paragraph 6 of the Agreement did not accurately set forth the understanding between Hobbs and AIM. Apparently, Hobbs interpreted that provision to mean that until January 1, 1978, AIM would make all payments required under the purchase contract between SME and Gulfstream relative to the Jacaranda property. AIM's counsel, however, interpreted Paragraph 6 to mean that AIM could use any means possible to preserve the property and that it was not strictly bound to the repayment schedule or terms set forth in the original purchase agreement. To that end, AIM, at the time the Settlement Agreement was executed and allegedly without the knowledge of Hobbs or the court, proposed to Gulfstream a plan whereby the delinquent interest would be added to the principal amount of the note and the terms and schedule of repayment would be modified. The negotiations further contemplated the delivery to Gulfstream, in escrow, of a deed in lieu of foreclosure which could be recorded in favor of Gulfstream without normal foreclosure if the partnership failed to make any payment. Hobbs contended that this plan violated Paragraph 6 of the Settlement Agreement in that it placed title to Jacaranda in immediate jeopardy and reduced the partnership's equity in the property. In any event, as evidenced by a letter from Gulfstream to AIM and Weenig dated April 5, 1976, the negotiations failed when an initial payment from AIM was dishonored, and Gulfstream initiated foreclosure proceedings.

dered AIM and Weenig to pay Hobbs' costs and legal expenses arising out of their refusal to perform their obligations under the Settlement Agreement and Order in an amount to be determined by the court.[5] The court declined to find AIM or Weenig in civil contempt.

In June 1976, Hobbs learned that AIM was no longer able to make the required payments on Jacaranda. In a letter to Gulfstream dated June 16, 1976, Weenig attributed AIM's financial difficulties to the cost of legal work in connection with litigation other than with Hobbs to which AIM and Weenig were parties and to internal expenditures in the management of AIM. On June 28, 1976, Hobbs filed another motion for enforcement and for a contempt adjudication against AIM and Weenig, alleging that Weenig had violated the court's May 19 injunction and had caused AIM to violate the Settlement Agreement and the court's prior orders by dispersing its funds to matters other than the Jacaranda obligations. Hobbs prayed that Weenig be ordered personally to make the delinquent and current payments on Jacaranda to the extent that they were not timely made by AIM, and that AIM and Weenig be held in civil contempt. AIM and Weenig jointly responded with briefs, affidavits, and exhibits attempting to rebut Hobbs' contention that Weenig had directed AIM's available assets to matters other than the performance of the Settlement Agreement. According to Hobbs, a conference was held in chambers on August 9, 1976, with counsel for Hobbs and counsel for AIM and Weenig present, and on September 2, 1976, evidence from both sides, including Weenig's live testimony, was taken at a hearing on Hobbs' motion in open court. This hearing was not transcribed. See n. 16 *infra*. At the hearing, avers Hobbs, the court made certain settlement recommendations and Hobbs' motion was held in abeyance pending the parties' attempts to work out an amicable resolution of the situation. Apparently, in light of the pending foreclosure

proceedings on Jacaranda, the court indicated its intention to act on Hobbs' motion if the matter was not resolved by September 16, 1976.

Although the matter was not settled in accordance with the foregoing, the court took no action. On November 29, 1976, counsel for AIM and Weenig informed the court that Weenig had resigned as President and director of AIM, that AIM was without officers and directors, and that its remaining assets and affairs were being managed by Weenig Enterprises in Utah. In a word, AIM was defunct.

On December 13, 1976, the district court issued an opinion and order scheduling an additional hearing on December 20, 1976. The opinion noted that Hobbs' motions remained unresolved and that the hearing would be held to resolve all issues which had arisen as a result of the Settlement Agreement. Hobbs alleges that at the hearing it submitted that the Jacaranda payments had not been made, that the tax consequences and filings guaranteed by AIM and Weenig in Paragraph 7 of the Agreement had not come about, and that Weenig had prevented AIM from making the Jacaranda payments and had allowed AIM to use its assets to such an extent that it became incapable of making the payments on the property. On January 5, 1977, Hobbs' counsel, apparently at the court's suggestion, submitted a motion to reduce the Settlement Agreement to judgment against AIM and Weenig and for reimbursement of its counsel fees and expenses. The motion prayed for judgment against AIM and Weenig, jointly and severally, in the amount of $131,856.37, plus interest, as damages for the nonpayment by AIM of the Jacaranda obligations. The alleged basis of Hobbs' damage claim was that its investment or contribution of $150,-000 to SME's initial capitalization entitled it to a "9.375% equity interest in all assets of SME," and thus, the danger of foreclosure of Jacaranda entitled Hobbs to damages of

---

5. On June 21 23, 1976, Hobbs submitted applications and affidavits in support of the award of counsel fees and expenses in the amount of

$4,836, but these were not acted upon by the court until the judgment of January 24, 1977.

9.375% of the price which SME had agreed to pay on an installment basis for that realty ($1,406,468), or $131,856.37. In addition, the motion asserted a violation by AIM and Weenig of Paragraph 7 of the Settlement Agreement (the tax consequence provision) and requested counsel fees and expenses in the amount of $4,836.[6] In response to Hobbs' motion, AIM and Weenig asserted their good faith efforts to preserve Jacaranda from foreclosure, denied the damage claim (specifically stating that Hobbs, "by virtue of his investment in SME, acquired no equitable or legal interest in the partnership realty and, consequently, does not have an interest in Jacaranda, that is 'not less than $131,856.37' as is alleged"), and denied Hobbs' right to counsel fees and expenses as inappropriate as a matter of law.

On January 24, 1977, the court, without any further hearing or proceeding and "upon consideration of plaintiff's Motion and in consideration of the testimony and other evidence presented by the parties at the various hearings in this matter and by affidavit," entered the requested judgment. The court ordered: "that paragraph 6 of the . . . Settlement Agreement . . . is reduced to judgment, and judgment is entered against defendants . . . AIM . . . and . . . Weenig . . . , jointly and severally, and in favor of plaintiff Hobbs . . . in the amount of $131,856.37, plus interest at six (6%) per cent per annum from January 6, 1976"; "that paragraph 7 of the Settlement Agreement is reduced to judgment, and judgment

is entered against defendants AIM and Weenig, jointly and severally, thereunder"; and "that plaintiff is hereby granted judgment for its legal fees and expenses incurred in procuring enforcement of the Settlement Agreement in the amount of $4,836." AIM and Weenig appeal from that judgment.

Appellants first contend that the award of damages by the district judge in favor of Hobbs was unauthorized both at law and under the specific terms of the Settlement Agreement. Appellants acknowledge that a district court generally has jurisdiction to enforce a settlement agreement entered into under its aegis, *Kelly v. Greer*, 365 F.2d 669 (3d Cir. 1966), *cert. denied*, 385 U.S. 1035, 87 S.Ct. 772, 17 L.Ed.2d 682 (1967), and as part of its enforcement powers to award damages for breach of such an agreement, *Walther & Cie v. U. S. Fidelity & Guaranty Co.*, 397 F.Supp. 937 (M.D.Pa. 1975).[7] However, Paragraph 10 of the Settlement Agreement expressly provided that a default by any settling defendant would void the dismissal of the action as to that defendant, permitting plaintiff to reinstitute the litigation, with the defaulting defendant thereafter deprived of certain claims and specified defenses. Appellants thus argue that the inclusion in the Agreement of this express remedy, together with the absence of any language concerning a recovery of damages for nonperformance,[8] precluded the court from awarding damages upon appellants' failure to comply with the terms of the Agreement.[9] Appel-

---

**6.** This was the amount originally requested by Hobbs' counsel subsequent to the court's order of May 19, 1976. *See* note 5 *supra*.

**7.** In *Walther & Cie v. U. S. Fidelity & Guaranty Co., supra*, the court stated: "Under the general powers of the court, a settlement having taken place in a judicial proceeding, this court may direct a judgment directly in favor of one who has suffered damages as a result of a breach of the settlement agreement by a subscribing party. . . . When parties negotiate a compromise and settlement, this court has authority to see that it is carried out and to award damages for breach thereof. . . . To hold otherwise would undermine the judicially-favored resolution of the litigation

through settlement." 397 F.Supp. at 946 (citations omitted); *see Kelly v. Greer, supra*, at 672.

**8.** While parties may stipulate in a settlement agreement to the entry of judgment for a sum certain upon the occurrence of a specified event, such as default, *All States Investors, Inc. v. Bankers Bond Co.*, 343 F.2d 618 (6th Cir.), *cert. denied*, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965), no such provision was included in the present Agreement.

**9.** Noting that a judgment enforcing a settlement agreement is analogous to a "judgment by consent," *Kukla v. National Distillers Products Co.*, 483 F.2d 619, 621 (6th Cir. 1973),

lee Hobbs argues that notwithstanding the inclusion of this express remedy,[10] a further provision of Paragraph 10, stating that "this Court shall retain jurisdiction of this action solely for the purpose of enforcing the undertakings contained in this Stipulation and Agreement," authorized the court to award damages for breach of the settlement contract.[11]

The contentions of the parties raise a question respecting the proper construction and interpretation of the Settlement Agreement on which we decline to rule, the matter apparently never having been raised in the district court in the first instance and the present record being insufficient to determine the intent of the parties with respect to the remedies contemplated in Paragraph 10. *See Aro Corporation v. Allied Witan Co.*, 531 F.2d 1368, 1371 n. 1 (6th Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976); *Florida Education Association, Inc. v. Atkinson*, 481 F.2d 662, 663 (5th Cir. 1973); *Lichtenstein v. Lichtenstein*, 454 F.2d 69, 71 (3d Cir. 1972) and 425 F.2d 1111, 1113 n. 2 (3d Cir. 1970). However, even assuming that the district judge was not precluded by the terms of the Settlement Agreement from entertaining Hobbs' motion for damages, remand of this case is necessary because damages should not have been awarded *summarily* under the circumstances here presented.[12] Al-

though it is well established that district courts generally have the power to enforce summarily, on motion, settlement agreements entered into with their approval, *Kelly v. Greer, supra*, at 671, there are instances where the facts at issue are so complex or disputed that summary enforcement of the agreement is improper. As stated by the court in *Autera v. Robinson*, 136 U.S.App.D.C. 216, 419 F.2d 1197 (1969): "[I]t is apparent that the summary procedure for enforcement of unperformed settlement contracts is not a panacea for the myriad types of problems that may arise. The summary procedure is admirably suited to situations where, for example, a binding settlement bargain is conceded or shown, and the excuse for nonperformance is comparatively unsubstantial. On the other hand, it is ill-suited to situations presenting complex factual issues related either to the formation or the consummation of the contract, which only testimonial exploration in a more plenary proceeding is apt to satisfactorily resolve. We commend the summary practice for use in connection with problems capable of precise resolution without attendant hazard to the interests of the parties. At the same time, it is evident that beyond that point the convenience of the summary procedure must yield to the exigencies of safeguarding all legally protected rights that are involved." *Id.* at 219,

---

appellants argue that they never "consented" to an award of damages against them. According to appellants, the district judge should have reinstated the case for trial consistent with the terms of the Agreement. They add that if this remedy would not afford plaintiff satisfactory relief, plaintiff could sue the defaulting defendant for breach of the Settlement Agreement. *See Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974).

10. Appellee relies upon *American Steel Engineering Co., Inc. v. U. S. Fidelity & Guaranty Co.*, Civil Action No. 75–2131 (E.D.Pa. April 12, 1976), for the proposition that the inclusion of a provision in a settlement agreement giving plaintiff the right to reinstitute its action upon breach does not prohibit the court from enforcing the settlement agreement and awarding damages for its breach. However, in that case *the defendant's* obligation under the agreement

was to pay plaintiff certain amounts of money, and the court's enforcement order, which found the defendant in contempt, merely compelled payment of the amount originally due. Thus, the remedy imposed in *American Steel* was more in the nature of an enforcement order than a judgment for damages.

11. Appellee asserts that upon breach of the Agreement, as upon breach of any contract, it had the option of affirming the contract and moving for enforcement or disaffirming the contract and suing for damages.

12. At oral argument counsel for Hobbs appeared to concede the validity of this proposition, but insisted that the damage award herein was not determined summarily in that it was supported by sufficient evidence properly before the court.

419 F.2d at 1200; see Kukla v. National Distillers Products Co., supra, at 621–22.[13]

In the instant case the district judge entered not an enforcement order but rather a judgment for unliquidated damages, and, as shown in the above portion of this opinion, the facts surrounding appellants' alleged breach, the theory and amount of damages, and the party or parties properly liable for damages were complex and highly disputed issues. Although several conferences and at least one court hearing were convened, none of these proceedings was held subsequent to Hobbs' motion for damages and none apparently was addressed to the issue of damages.[14] Under these circumstances the district judge should have held a further proceeding to receive evidence from the parties bearing on the question of damages and other related issues.[15]

On the basis of the record before us, we are unable to review the remaining questions raised by appellants, viz., whether the district court erred in calculating Hobbs' damages, in entering judgment against Weenig personally for AIM's breach of Paragraph 6 of the Agreement, and in awarding attorneys' fees and expenses in favor of Hobbs. The judgment recited that the district judge relied, inter alia, upon "the testimony and other evidence presented by the parties at the various hearings in this matter." However, no records were ever taken or transcriptions made at said hearings,[16] and the district judge made no findings of fact or conclusions of law in support of the judgment. Nor was an opinion or memorandum handed down. While neither party contests the proposition that the district judge, given the proper circumstances, had the power to "pierce the corporate veil" in holding Weenig personally liable[17] and to award attorneys' fees and expenses to Hobbs,[18] we are left to speculate

---

**13.** We note that in *Walther & Cie v. U. S. Fidelity & Guaranty Co.*, discussed *supra* at note 7, the court, while broadly construing the authority of the district court to award damages for breach of a settlement agreement, awarded such damages only after evidence concerning the construction of the agreement and the measure and amount of damages had been adduced at an evidentiary hearing. 397 F.Supp. at 941.

**14.** As noted *infra*, no records or transcriptions of these hearings were ever made.

**15.** Although, as appellee stresses, appellants never requested an evidentiary hearing, the briefs and affidavits before the district judge clearly reflected a dispute as to appellants' alleged breach, the measure and amount of damages, and the propriety of holding Weenig personally liable. See Appendix at A68–A145. While we do not commend appellants' failure to request further proceedings in the district court, we think that in this case it was incumbent for the judge to develop the facts more fully before entering judgment.

**16.** Since at least one hearing was held in open court, we note that 28 U.S.C. § 753(b) requires court reporters to record verbatim "all proceedings in other [than criminal] cases had in open court unless the parties with the approval of the judge shall agree specifically to the contrary . . . ." At oral argument counsel for Hobbs explained that for reasons not necessary to state here appellants desired to conduct the proceedings off the record. Because the district judge apparently acquiesced in this request, we assume that the conditions of § 753(b) were met.

The desirability of having a court reporter present and at least taking notes has been repeatedly referred to by this court. *Carroll v. Frontera Compania Naviera*, 390 F.2d 311, 315 (3d Cir. 1968); *Jaconski v. Avisun Corporation*, 359 F.2d 931, 936 (3d Cir. 1966); and *United States v. Sigal*, 341 F.2d 837, 846–851 (3d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

**17.** Although ordinarily a stockholder, director, or officer of a corporation is not personally liable for the obligations of that corporation, see, e. g., *Bucks v. Buckwalter*, 419 Pa. 544, 215 A.2d 625 (1966), personal liability may be imposed in exceptional circumstances, often involving bad faith, contumacious behavior, or fraud. See, e. g., *Francis O. Day Co. v. Shapiro*, 105 U.S.App.D.C. 392, 267 F.2d 669 (1959); *Thomas v. E. C. Mutter Construction Co.*, 405 Pa. 509, 178 A.2d 570 (1962).

**18.** The current rule regarding the award of attorneys' fees has been summarized as follows: "Attorneys' fees and costs are not ordinarily recoverable and unless specifically authorized by statute are awarded only in extraordinary cases. . . . Exceptions to this general rule which are rooted in the inherent equity power of the courts consist of the power to assess attorneys' fees for the willful disobedience of a court order as part of the fine to be levied on a defendant . . . and the authority to

as to the basis of the district court's judgment. *See Kreda v. Rush*, 550 F.2d 888, 890 (3d Cir. 1977); *Goode v. Rizzo*, 506 F.2d 542, 549 (3d Cir. 1974), *reversed on other grounds*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Groh v. Brooks*, 421 F.2d 589, 594–95 (3d Cir. 1970); *O'Neill v. United States*, 411 F.2d 139, 146 (3d Cir. 1969); *Shahmoon Industries, Inc. v. Imperato*, 338 F.2d 449, 452 (3d Cir. 1964). "It is necessary that a Court state its reasons for granting or denying attorneys' fees, in order that the Court's action can be properly reviewed on appeal." *Taylor v. Perini*, 503 F.2d 899, 904 (6th Cir. 1974), *vacated on other grounds*, 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1975); *see Goode v. Rizzo, supra*, at 549; *Milburn v. Huecker*, 500 F.2d

1279, 1282 (6th Cir. 1974); *Lee v. Southern Home Sites Corp.*, 429 F.2d 290, 296 (5th Cir. 1970).[19] The same principle is applicable in order for this court to determine whether the extraordinary remedy of piercing the corporate veil was warranted on the facts of this case.[20] Similarly, although appellee contends that the district court acted within its discretion in awarding damages based upon the value of the partnership assets, we are unable to discern the proofs or theories upon which the district court relied.[21] Whether or not Rule 52(a), Fed.R. Civ.P., 28 U.S.C., is expressly applicable,[22] the case at bar is one which requires findings of fact and conclusions of law in respect to the relevant issues. *American*

award attorneys' fees when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Walther & Cie v. U. S. Fidelity & Guaranty Co., supra*, at 946 (citations omitted); *see Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Lichtenstein v. Lichtenstein*, 481 F.2d 682 (3d Cir. 1973), *cert. denied*, 414 U.S. 1144, 94 S.Ct. 895, 39 L.Ed.2d 98 (1974). We note that the instant Settlement Agreement was silent with respect to the matter of attorneys' fees.

**19.** Appellee argues that the word "refusal" in the court's Order of May 19, 1976, provides this court with·an adequate finding upon which to review the attorneys' fee award. The Order stated: "Defendants AIM and Weenig shall pay to plaintiff *instanter*, the sum to be determined by the Court as compensation for plaintiffs' costs and legal expenses arising out of said defendants' *refusal* to perform their obligations under the Settlement Agreement and the Order" (emphasis added). However, we think this an insufficient indication of the basis of the district court's award, especially in light of the fact that on two separate occasions appellee unsuccessfully petitioned the court to find appellants "in civil contempt . . . by reason of their willful breach of the Settlement Agreement." We add that in the cases cited by appellee the appellate courts were able to review specific findings of bad faith, vexatiousness, and so forth made by the district courts.

**20.** Indeed, appellee's lengthy recitation of the numerous bases upon which the district judge could have held Weenig personally liable only amplifies the need for proper findings.

**21.** As noted above, it appears that issues concerning the amount and theory of damages were not developed in any evidentiary proceeding. There is no indication on the record that

an attempt was made to apply a measure of damages such as that set forth in *Walther & Cie v. U. S. Fidelity & Guaranty Co., supra*, at 944, where the court, referring to the breached settlement agreement as a "contract," stated: "The court, therefore, must apply the general rule that where a contract is breached without legal justification, the injured party is entitled to recover, absent contrary provisions in the contract, whatever damages he suffered provided: (1) they were such as would naturally and ordinarily follow from the breach; (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract; and (3) they can be proved with reasonable certainty."

**22.** Rule 52(a) of the Federal Rules of Civil Procedure provides in pertinent part: "In all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon . . . . Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)." Although the parties have not specifically focused upon the applicability of Rule 52 to this case, appellee, in its brief, states cursorily that findings of fact and conclusions of law by the district court were not compelled by Rule 52. However, even though appellee's request for damages was framed in terms of a "motion," the district court's ruling on the motion involved the resolution of numerous factual issues. Thus, it is arguable that this was in reality an action "tried upon the facts without a jury." *See* 5A J. Moore, Federal Practice ¶ 52.08 (2d Ed.1977); *Interpace Corporation v. City of Philadelphia*, 438 F.2d 401, 405 (3d Cir. 1971) (Adams, J., dissenting).

*Cyanamid Co. v. Sharff*, 309 F.2d 790, 798 (3d Cir. 1962). The case must therefore be remanded to the district court so that the necessary findings of fact and conclusions of law may be made and the record augmented by further evidence if necessary.

Accordingly, for the reasons set forth herein, the judgment of the district court will be vacated and the case will be remanded for proceedings not inconsistent with this opinion.